**SENTRY SELECT INSURANCE CO.**

v.

**HOME STATE COUNTY MUTUAL INSURANCE CO. and Mark Lynn Stevens**

No. 5:12CV10

United States District Court, E.D. Texas, Texarkana Division.

September 5, 2013

Russell J. Bowman, Russell J. Bowman, Irving, TX, for Plaintiff.

Tarron Leigh Gartner–Ilai, Cooper & Scully PC, Dallas, TX, for Defendants.

### MEMORANDUM ORDER ADOPTING REPORT AND RECOMMENDATION

MICHAEL H. SCHNEIDER, UNITED STATES DISTRICT JUDGE

The above-entitled and numbered civil action was heretofore referred to United States Magistrate Judge Caroline M. Craven pursuant to 28 U.S.C. § 636. The Report of the Magistrate Judge which contains her proposed findings of fact and recommendations for the disposition of such action has been presented for consideration. No objections were filed to the Report and Recommendation. The Court is of the opinion that the findings and conclusions of the Magistrate Judge are correct. Therefore, the Court hereby adopts the Report of the United States Magistrate Judge as the findings and conclusions of this Court.

Accordingly, it is hereby

**ORDERED** that Motion for Summary Judgment of Home State County Mutual Insurance Company and Mark Lynn Stevens (Dkt. No. 19) is **DENIED.** It is further

**ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. No. 20) is **GRANTED.** It is further

**ORDERED** that Sentry has no duty to indemnify or defend Mark Lynn Stevens in connection with the lawsuits filed

against him by Donald and Barbara Roche, Cause Nos. 11CA919 and 11CA920 respectively, filed in the Circuit Court, Fifth Judicial Circuit, Lake County, Florida. arising out of the March 20, 2010 auto accident Stevens was involved in with Donald and Barbara Roche

**SIGNED this 5th day of September, 2013.**

## REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

CAROLINE M. CRAVEN, UNITED STATES MAGISTRATE JUDGE

The above-referenced case was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. Before the Court are the following pending motions: Motion for Summary Judgment of Home State County Mutual Insurance Company and Mark Lynn Stevens (Docket Entry # 19) and Plaintiff's Motion for Summary Judgment (Docket Entry # 20). The Court, having reviewed the relevant briefing, recommends Defendants' motion for summary judgment be **DENIED** and Plaintiff's motion for summary judgment be **GRANTED.**

## I. FACTUAL BACKGROUND

On January 27, 2012, Plaintiff Sentry Select Insurance Company ("Sentry") filed this action for Declaratory Judgment against Home State County Mutual Insurance Company ("Safeco") and Mark Lynn Stevens ("Stevens") (collectively "Defendants"). This insurance coverage action

arises out of an automobile accident that occurred on March 20, 2010 in Florida between Stevens and Barbara and Donald Roche. At the time of the accident, Stevens was driving an automobile owned by Classic Motors of Texarkana, Inc. ("Classic") on a personal trip to Florida. As a result of the accident, the Roches filed two lawsuits against Stevens, seeking damages for injuries allegedly sustained by them resulting from the automobile accident. On November 1, 2012, the Court granted the Roches unopposed motion to intervene in this cause of action.

Sentry insures Steven's employer Classic under a Garage Liability Policy. Safeco insures Stevens under a Personal Auto Policy. The parties' cross motions for summary judgment require the Court to determine whether Sentry's garage liability policy issued to Classic, or Stevens' personal auto policy with Safeco, provides primary coverage to Stevens concerning his auto accident with the Roches.

## II. THE PARTIES' POSITIONS

### A. Sentry's motion

Although Sentry's amended complaint sought a declaration that Sentry's liability under its policy should the Roches obtain judgment against Stevens would be pro rata with Safeco,[1] Sentry seeks summary judgment that Stevens' personal auto policy with Safeco provides primary coverage as to Stevens and that Sentry has no duty to defend or indemnify Stevens in connection with the lawsuits filed against him by the Roches. According to Sentry, the critical inquiry is whether Stevens constitutes an "employee" in this case (which would

---

1. Although Sentry alleges the "escape clause of the Sentry garage policy" and the "excess clause" of the Safeco personal auto policy are conflicting and should be deemed mutually repugnant, so that the insurers share in the loss on a pro rata basis, Sentry does not argue this point in its motion for summary judg-

ment. As urged by Defendants in their cross motion for summary judgment, the clauses do not fall within any of the "conflicting" categories set out in *Hardware Dealers Mutual Fire Ins. Co. v. Farmers Ins. Exchange,* 444 S.W.2d 583, 589–90 (Tex.1969). The Court does not find the clauses mutually repugnant.

make an applicable Sentry limit of $500,000 per accident), or whether Stevens falls under the category of a permissive user, which would make the Sentry policy inapplicable since Stevens' Safeco personal auto liability insurance meets the minimum amounts required by Florida law.

Sentry describes three different "classes of insured" under Classic's garage liability policy: (1) the named insured (Classic), (2) employees of Classic, and (3) anyone else required by law to be an insured while using a covered auto owned by Classic, i.e., a "permissive user." Docket Entry # 20 at pg. 9. Sentry characterizes Stevens as a customer at the time of the accident and therefore a permissive user for purposes of the Sentry policy. *Id.* at pg. 8. Sentry asserts Stevens is not a Classic employee for purposes of the accident involved in this matter because Stevens was not acting in the course and scope of his employment at the time of the accident.

According to Sentry, under the Classic garage liability policy, "the amount of coverage that would be available under the Sentry policy for the category of insureds that constitute ... permissive user[s] would only be the minimum limits required by Florida law (since that is where the accident occurred) and only in the amount needed to comply with the minimum limits of insurance required by such state after the driver's other insurance has been exhausted." *Id.* at pg. 9. Sentry states the limits of the Safeco policy are in excess of the minimum amounts required by Florida law. Therefore, Sentry asserts Classic's garage liability policy would not provide any coverage to Stevens as a matter of law if Stevens is properly considered a customer/permissive user rather than an employee. According to Sentry's position, if Stevens does not constitute an employee, § 1952.252 of the Texas Insurance Code governs, making Stevens' policy with Safeco the primary coverage in this matter.

## B. Defendants' motion

Defendants assert the Sentry policy provides primary coverage for employees who are using covered autos owned by Classic, with Classic's express permission. According to Defendants, Stevens was an employee at the time of the accident, not a customer or permissive user. Defendants contend Classic's garage policy issued by Sentry covers the accident up to $500,000.

In arguing Stevens was an employee rather than a customer, Defendants specifically assert the Sentry policy expressly insures employees driving demo cars with Classic's permission. Defendants point out Stevens had Classic's express permission to take one of the dealership's cars to Florida; there were no restrictions on his use of the automobile; and he did not pay to rent the automobile he was driving at the time of the accident. Thus, Defendants assert Stevens' use of the Classic automobile was not as a "loaner" or a rental but as a demo vehicle. In further support of its characterization of Stevens as an employee, Defendants assert Classic did not have a policy of allowing people who were not employees to drive cars owned by Classic; the standard practice in the car dealership industry allows employees to drive cars owned by the dealership; and Stevens testified he did not drive his own Saturn but instead drove Classic demos. According to Stevens, he never intended to drive his own personal vehicle to Florida, and the car he was driving at the time of the accident was not a substitute (or loaner) for his personal vehicle that was in the shop for repairs.

## III. SUMMARY JUDGMENT EVIDENCE

### A. The parties' evidence

In its motion for summary judgment, Sentry relies on the following summary

judgment evidence: (1) Affidavit of Brian Rutta ("Rutta Aff."); (2) Sentry's Garage Insurance Policy for Classic Motors of Texarkana, Inc., Policy No. 24–46762–01 (effective 02–01–10 to 02–01–11) ("Classic garage policy"); (3) Affidavit of Sentry's attorney, Russell J. Bowman ("Bowman Aff."); (4) October 24, 2012 deposition of Mark Lynn Stevens ("Stevens Depo.") with attachments; and (5) Complaints from the lawsuits filed by the Roches against Stevens and Classic ("Florida Complaints").

In their motion for summary judgment, Defendants rely on the following summary judgment evidence: (1) Sentry's Garage Insurance Policy for Classic Motors of Texarkana, Inc., Policy No. 24–46762–01 (effective 02–01–10 to 02–01–11) ("Classic garage policy"); (2) Excerpts from the October 24, 2012 deposition of Mark Lynn Stevens ("Stevens Depo."); (3) The agreement between Stevens and Classic ("Rental Agreement"); (4) The Original Petition filed by Barbara Roche against Mark Stevens and Classic Motors of Texarkana, Inc.; (5) Safeco Policy No. Y526005 ("Stevens personal policy"); and (6) Affidavit of Robert Kallina ("Kalline Aff."). The summary judgment evidence establishes as follows.

## B. The accident

Defendant Stevens has worked at Classic since 2007. Stevens Depo. at 7:9–12. At the time of the automobile accident and at the time of his deposition, Stevens was employed as a sales manager. *Id.* at 7:17–19. As a sales manager, Stevens is in charge of all sales in the pre-owned department; he heads up a team of 13 salesmen. *Id.* at 7:20–24.

In March 2010, Stevens took off work for one week to take his wife and three children on vacation to Walt Disney World. This was one of the three weeks of vaca-

tion a year which Stevens receives with Classic. *Id.* at 8–9. Stevens' boss, the general manager, was aware Stevens was going to take a Classic vehicle on vacation. *Id.* at 29:16–23.

Before he left for vacation, Stevens signed a "Rental Agreement" for the use of a Classic automobile during his family vacation to Florida. The "Rental Agreement" contains a boilerplate paragraph titled "Insurance." It provides as follows:

6. *Insurance.* You are responsible for all damage or loss You cause to others. You agree to provide auto liability, collision and comprehensive insurance covering You, Us and the Vehicle. Your insurance is primary. However, if you have no auto liability insurance in effect on the date of a loss, or if We are required by law to provide [sic] liability insurance, We provide auto liability insurance (the "Policy) that is secondary to any other valid and collectible insurance whether primary, secondary, excess or contingent. The policy provides bodily injury and property damage liability coverage with limits no higher than minimum levels prescribed by the State [sic] whose laws apply to the loss. You and We reject PIP, medical payment, no-fault and uninsured and underinsured motorist coverage, where permitted by law. The Policy is void if you violate the terms of the Agreement or if you fail to cooperate in any loss investigation conducted by Us or Our insurer. Giving the vehicle to an unauthorized driver terminates Our liability insurance coverage, if any.

Stevens' Depo., Ex. 3.

On March 20, 2010, while returning home, Stevens was involved in a car accident with Barbara and Donald Roche in Florida. *Id.* at 8:3–15. Stevens was not in Florida for any reason connected with his employment. *Id.* at pgs. 10:6–9. At the

time of the accident, Stevens was driving a 2008 black Suburban that he had "rented" from Classic. *Id.* at 10:15–23. According to Stevens, the rental agreement resulted from the fact that Stevens was having some repairs/warranty work performed on his personal Saturn during the vacation; he had turned in his demo and his boss wanted him to sign a rental agreement in case he had a wreck. *Id.* at 10:24–11:4 & 12:3–13:4. Stevens stated the Suburban was "kind of a rental and kind of a demo." *Id.* at 11:3–5. Stevens did not have to pay any money for the use of the Suburban, other than for fuel and for its repair after the accident. *Id.* at 46:15–20.

Stevens was able to drive the Suburban home following the accident. *Id.* at 13:10–15. "The only thing wrong with it was it had a cut in [the plastic front cover on the front of the car]." *Id.* at 13:17–21. At that time, sales managers could "just get in [any] car and drive it;" he could drive "whatever [he] wanted" to lunch or home. *Id.* at 14:3–8. Although Stevens owned the Saturn, Stevens did not have a car he drove to work "back then;" he just drove whatever demo he wanted to and from home. *Id.* at 14:15–17 & 18:17–22. Now, the managers are assigned a specific car for 60 days. *Id.* at 14:18–19. Stevens is now required to sign a "demo agreement" every time he takes a vehicle off of the dealership lot for traveling to and from work. *Id.* at 30:10–18. Stevens never intended to drive his Saturn to Florida, and he did not consider the Suburban a substitute for the Saturn. *Id.* at 48:9–14.

Stevens returned home with the Suburban and drove it to the dealership on Monday when he reported to work. *Id.* at 18:3–10. On Monday, Stevens informed the general manager about the wreck and stated he wanted to pay for the repair out of his own pocket. *Id.* at 22:4–17. According to Stevens, the general manager told him to hold on to the Suburban until he could get it fixed. *Id.* at 22:14–17. Stevens drove the Suburban for a couple more days until the "paint guy" showed up at the dealership on Thursday to fix it. *Id.* at 18:10–15. Stevens had it repaired for about $125 and then later sold it. *Id.* at 13:21–22. At some point, Stevens made a copy of the rental agreement and sent it to Defendant. *Id.* at 46:5–7.

In March 2010, Classic "only had loaner vehicles for customers who were having their repairs completed at that time." *Id.* at 35: 14–18. At that time, Classic was not in the business of renting vehicles to the public unless they were getting service. *Id.* at 36:1–10. Now Classic actually rents cars. *Id.* at 35:6–9.

Classic owned the vehicle that was being driven by Stevens at the time of the accident. Stevens Depo. at 9–10; Rental Agreement at pgs. 1–2. According to Defendants, the Suburban was in Stevens' care, custody, and control at the time of the accident, and Stevens had Classic's express permission to use the vehicle.

## C. Underlying lawsuits

The Roches filed separate lawsuits in Florida against Stevens for alleged injuries resulting from the automobile accident. Stevens was sued for various alleged acts of negligence. Florida Complaints at pgs. 2 & 6.

## D. Sentry insurance policy issued to Classic

Plaintiff was the insurance company for Classic at the time of the accident. Classic garage policy at pgs. 16–48. The Sentry garage policy provides coverage for accidents resulting from garage operations as follows:

2. 'GARAGE OPERATIONS'—COVERED 'AUTOS'

We will pay all sums an 'insured' legally must pay as damages, including punitive damages where insurable by law, because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from 'garage operations' involving the ownership, maintenance or use of covered 'autos.'

\* \* \*

We have the right and duty to defend any 'insured' against a 'suit' asking for such damages or a 'covered pollution cost or expense.' However, we have no duty to defend any 'insured' against a 'suit' seeking damages for 'bodily injury' or 'property damage' or a 'covered pollution cost or expense' to which this insurance does not apply. We may investigate and settle any claim or 'suit' as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance—'Garage Operations'—Covered 'Auto' has been exhausted by payment of judgments or settlements.

*Id.* at pg. 75.

The term "garage operations" means the ownership, maintenance or use of locations for garage business and that portion of roads or other accesses that adjoin such locations. *Id.* at pg. 5. A "covered auto" under the Sentry policy is designation "21." *Id.* at pg. 24. That designation means any auto. *Id.* at pg. 71. The following are insureds under the Sentry policy:

3. WHO IS AN INSURED

a. The following are 'insureds' for covered 'autos':

(1) You for any covered 'auto'.

(2) Your partners (if you are a partnership), members (if you are a limited liability company), shareholders, officers, directors, 'employees', 'temporary workers' and members of their or your households while using or legally responsible for the use of a covered 'auto' you own, hire (a covered 'auto') you hire includes an 'auto' rented by your 'employee' or 'temporary worker' for use in your company business) or borrow, if the use is within the scope of your permission.

(3) Except as provided in b.(2) below, your 'employee' or 'temporary worker' while using a covered "auto" you do not own, hire or borrow in your garage business.

(4) Individuals, including members of their households, furnished a covered 'auto' by you for their regular use, but only if the individual is specifically named in the Declarations and only while using or legally responsible for the use of the furnished covered 'auto.'

(5) Any 'contract driver.'

(6) Anyone else required by law to be an insured while using a covered 'auto' you own, hire or borrow, if the use is within the scope of your permission.

(7) Anyone liable for the conduct of an 'insured' described above, but only to the extent of that liability.

*Id.* at pgs. 75–76.

The policy issued by Sentry is primary to all other insurance available for a covered "auto" owned by Classic:

5. OTHER INSURANCE

a. For any covered 'auto' you own, this Coverage From provides *primary insurance, except it provides excess insurance* while the covered 'auto' is in the care, custody or control of any person or organization other than you, your partners (if you are a partnership), members (if you are a limited

liability company), stockholders, officers, directors, 'employees,' 'temporary workers,' individuals furnished a covered "auto" and named in the Declarations or the members of their or your own household.

b. For any covered 'auto' you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance. . . .

*Id.* at 77 (emphasis added).

The Sentry policy provides coverage for $500,000 per occurrence for garage operations involving the use of an auto, with the following applicable exceptions. Under the "LEASED AUTO" provision, this insurance does not apply to any covered "auto" while leased or rented to others. *Id.* at pg. 81. However, the exclusion does not apply to a covered "auto" the company rents to a customer while having his "auto" left for service or repair or while the customer is awaiting delivery of an "auto" after signing a written purchase agreement or to an "employee" while a leased or rented "auto" is in the company's custody for service, repair, pickup, or deliver in the course of the company's business. *Id.*

The other provision of the Sentry policy, "LIMIT OF INSURANCE," makes the Sentry policy provide coverage for any person required by law to be insured while using, with permission, a covered auto owned by Classic, but only up to the applicable state law minimum limits of liability of the state where the accident occurred. *Id.* at pgs. 85–87. The specific provision in question (which will be referred to as the "LIMIT OF INSURANCE" provision) provides as follows:

3. LIMIT OF INSURANCE—'GARAGE OPERATIONS—COVERED 'AUTOS'

For 'accidents' resulting from 'garage operations' involving the ownership, maintenance or use of covered 'autos,' the following applies:

Regardless of the number of covered 'autos,' 'insureds,' premiums paid, claims made or vehicles involved in the 'accident,' the most we will pay for the total of all damages and 'covered pollution cost or expense' combined resulting from any one 'accident' involving a covered 'auto' is the Each 'Accident' Limit of Insurance—'Garage Operations' Covered 'Autos' for Liability Coverage shown in the Declarations.

For 'contract drivers' and anyone required by law to be an 'insured' for the use of a covered 'auto,' the most we will pay for all damages resulting from one 'accident' involving a covered 'auto' is that portion of the Each 'Accident' Limit of Insurance—'Garage Operations'—Covered 'Autos' needed to comply with the minimum limits provisions of the law in the jurisdiction where the 'accident' took place. When there is other insurance applicable to the 'accident,' we will pay only the amount needed to comply with these minimum limits after the other insurance is exhausted.

*Id.* at pgs. 86–87.

According to Sentry, the minimum auto liability insurance requirements of Florida law, since two claimants are involved, would amount to limits of $20,000 for bodily injury and $10,000 for property damage. *See* § 324.021(7), Fla. Stat. (Supp. 2012).

E. **Safeco's insurance policy issued to Stevens**

At the time of the accident, Stevens had a personal auto liability policy issued to him by Safeco. The Safeco policy provides liability coverage of $25,028 per person or $50,028 per accident for bodily injury and

$25,028 for property damage. The Safeco policy contains the following provision regarding "OTHER INSURANCE:"

> If there is other applicable liability insurance available any insurance we provide shall be excess over any other applicable liability insurance. If more than one policy applies on an excess basis; we will bear our proportionate share with other collectible liability insurance.

Stevens' personal policy at pg. 6. According to Safeco, Safeco's policy contains an excess clause while Sentry's policy contains a primary clause, and neither policy contains a provision which is reasonably subject to a construction which conflicts with a provision in the other. As interpreted by Safeco, Sentry's policy is always primary, while in the care, custody or control of Classic, and its "employees" such as Stevens.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The movant bears the responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir.1992), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

The nonmovant is not required to respond to a motion for summary judgment until the movant first meets its burden of demonstrating that there are no factual issues warranting trial. *Ashe v. Corley*, 992 F.2d 540 (5th Cir.1993). Once the movant has shown the absence of material fact issues, however, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e). It is not enough for the party opposing summary judgment to rest on mere conclusory allegations or denials in his pleadings. *Topalian*, 954 F.2d at 1131. The nonmovant must point out, with factual specificity, evidence demonstrating the existence of a genuine issue of material fact on every component of the nonmovant's case. *Dunn v. State Farm & Casualty Co.*, 927 F.2d 869, 872 (5th Cir. 1991). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Where the background facts are undisputed, courts recount them according to the summary judgment record developed through the parties' cross-motions. Where the facts are materially disputed, the court recounts the evidence in a light favorable to the nonmovant on that issue and draws all reasonable inferences in favor of the nonmovant. See, e.g., *Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 617 n. 2 (N.D.Tex.2007) (Fitzwater, J.) (in context of cross-motions, construing evidence favorably to party against whom summary judgment was being entered) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n. 2 (N.D.Tex.2006).

## V. APPLICABLE LAW

■ It is undisputed that the law of Texas applies. General rules of contract

construction apply to the interpretation of the terms of an insurance contract. *See State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995). In construing a contract, Texas courts strive to effectuate the intentions of the parties as they are expressed in the contract. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994); *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995). If the policy language is unambiguous, it must be enforced as written. *Upshaw v. Trinity Companies,* 842 S.W.2d 631, 633 (Tex.1992); *State Farm Lloyds v. Kessler,* 932 S.W.2d 732, 736 (Tex.App.–Fort Worth 1996, writ denied). To do so, the Court must read all parts of a contract together. *Forbau,* 876 S.W.2d at 133–134.

■ In determining the parties' intent, the Court must examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless. *Gilbert Texas Constr., L.P. v. Underwriters at Lloyd's London,* 327 S.W.3d 118 (Tex.2010). The policy's terms are given their ordinary and generally accepted meaning unless the policy shows the words were meant in a technical or different sense. *Sec. Mut. Cas. Co. v. Johnson,* 584 S.W.2d 703, 704 (Tex.1979). Where the policy is ambiguous, it will be presumptively construed against the drafter of the instrument. *Utica Nat'l. Ins. Co. of Texas v. Am. Indem. Co.,* 141 S.W.3d 198 (Tex.2004).

## VI. DISCUSSION

### A. Whether Sentry has a duty to indemnify Stevens in the underlying lawsuits

#### 1. Applicable law

■ While the duty to defend depends on the allegations in the underlying lawsuits, the "duty to indemnify is triggered by the actual facts that establish liability in the underlying lawsuit." *Ooida Risk Retention Group, Inc. v. Williams,* 579 F.3d 469, 472 (5th Cir.2009). An insurer's duty to defend and duty to indemnify are district. *Id.* The Court first considers whether Sentry has a duty to indemnify Stevens in the underlying lawsuits.

#### 2. Whether Stevens was an employee or customer/permissive user of Classic under the Sentry policy

■ The Safeco personal auto liability policy issued to Stevens provides that Safeco will defend any "insured" and pay damages for bodily injury or property damage for an "insured" who becomes legally responsible because of an auto accident. Safeco personal policy at pg. 22. The policy "shall be excess over any other applicable liability insurance." The Court must determine whether the Sentry garage liability policy issued to Classic is properly considered other applicable liability insurance.

Sentry maintains Stevens was on vacation at the time of the accident and was not engaged in any activity for his employer, Classic, at the time of the accident. Instead, Sentry argues that Stevens was a customer of the dealership at the time of the loss because he left a personal vehicle at the shop during his vacation. Thus, argues Sentry, Stevens was a "permissive user" of the Suburban for purposes of Sentry's policy, and pursuant to the "LIMIT OF INSURANCE" provision the Sentry policy provides coverage only up to the applicable state law minimum limits of liability of the state where the accident occurred. According to Sentry, under the Classic garage liability policy, "the amount of coverage that would be available under the Sentry policy for the category of insureds that constitute ... permissive user[s] would only be the minimum limits

required by Florida law (since that is where the accident occurred) and only in the amount needed to comply with the minimum limits of insurance required by such state after the driver's other insurance has been exhausted." Docket Entry # 20 at pg. 9.

In determining whether Stevens was a Classic employee or customer/permissive user at the time of the accident, the Court starts with the express terms of the garage liability policy. There are three relevant "classes of insured" under Classic's garage liability policy: (1) the named insured (Classic)(Section 3(a)(1)), (2) employees of Classic, if the use is within the scope of Classic's permission (Section 3(a)(2)), and (3) "anyone else required by law to be an insured" while using a covered auto owned by Classic if the use is within the scope of Classic's permission (i.e., a "permissive user")(Section 3(a)(6)). The "LIMIT OF LIABILITY" provision relied upon by Sentry expressly applies to the persons insured under Section 3(a)(6).

Defendants assert Stevens is insured under Section 3(a)(2), not Section 3(a)(6), and as such, Sentry's policy is primary and the full limits of the policy apply to the Roches' claims. According to Defendants, as it pertains to a garage liability policy, Section 3(a)(6) is included as a statutorily mandated provision that applies to garage and auto dealership customers, not employees. *See* TEX. INS. CODE § 601.076. Although Defendants acknowledge a garage customer's policy is primary (and is the only statutorily created exception to the "insurance follows the car" rule in Texas), Defendants contend employees fall into a different category (employers are not required to provide insurance for their employees like for customers). Defendants contend Stevens is expressly insured an as employee, not as a "person required by law to be insured."

In asserting Stevens should be classified as a permissive user under Section 3(a)(6) rather than an employee under 3(a)(2) for purposes of coverage, Plaintiff relies on *Integon Indemnity Corp. v. Federated Mutual Ins. Co.*, 131 N.C.App. 323, 507 S.E.2d 53 (N.C.1998). There, the North Carolina court considered whether an employee (Branson), who was getting his car repaired by his employer (Montgomery Motors), was a "customer" or an "employee" under the terms of the insurance policy at issue. *Id.* at 324, 507 S.E.2d 53. Branson's personal car was in the employer's shop being repaired, and the employer provided Branson an "automobile on loan for his personal use." *Id.* at 324, 507 S.E.2d 53. The garage policy included employees of the named insured as insureds, but it excluded customers of the insured from coverage. The policy provided that the term "customers" included "your employees ... who pay for [repair] services performed." *Id.* at 325, 507 S.E.2d 53. The court held that Branson was a customer of the employer for purposes of determining whether the employee was entitled to coverage under the employer's garage policy when involved in an accident while driving the loaner car. Therefore, Branson was not entitled to coverage under the employer's garage liability policy.

According to Defendants, Stevens testified he did not drive his own Saturn to work so even though the Saturn was in the shop being repaired, he never intended to drive the Saturn to Florida. In other words, Defendants assert the Suburban, which Defendants characterize as a demo, was not a substitute for Steven's personal automobile that was in the shop for repairs, distinguishing this case from *Integon.* Defendants assert the Declarations of Sentry's policy identifies employees driving furnished autos (including demos) as

specific classifications of operators insured under the policy, including sales persons and other employees if provided a furnished auto.[2] Defendants state the use of demo cars by dealership employees is a fundamental cornerstone of the auto dealer industry, and a finding that Stevens was a customer rather than an employee would destroy the cornerstone.[3] Defendants assert Stevens was using the Suburban not as a loaner or rental but as a furnished auto or demo with the express permission of Classic at the time of the accident; thus, Stevens falls within the express terms of Section 3(a)(2) regarding employees using autos within the scope of Classic's permission.

In support of its argument that Stevens was driving a demo, not a loaner or rental car, Defendants cite Stevens' testimony showing that he was generally entitled to use demo cars for personal use and that he never intended to take his personal Saturn to Florida. However, the evidence shows that the Suburban was not obtained as Stevens normally obtained demo cars. Unlike Stevens' use of demo cars at that time, wherein no paperwork was required and Stevens could choose any car and drive it, Stevens' boss specifically required Stevens to sign a rental agreement to take the Suburban to Florida for a family vacation. Stevens testified that his "boss just wanted [him] to sign a rental agreement, I guess, in case I had a wreck." Stevens' Depo. at 10:24–11:4 & 12:3–13:4.

At that time, Classic only rented cars to customers who were having repair work done on their cars at Classic. It is undisputed Stevens was having work done on his Saturn. Although Defendants point out that Stevens was not required to pay a rental fee for the Suburban, Stevens explained that because he was having warranty work done on his Saturn, he did not have to pay any money out of pocket for use of the Suburban. The rental agreement also provides as follows:

> If your vehicle is being serviced by Us under Factory warranty Our right ... to repair Your vehicle during the rental is considered by Us as the rental fee. No additional consideration is necessary, except for fuel You use and do not replace.

Stevens' Depo., Ex. 1. The Court finds there was consideration for the rental agreement Stevens was required to sign.

Finally, the Court notes the Suburban was over three years old with over 50,000 miles on it, further refuting Defendants' argument that the Suburban was a demonstrator vehicle. *Id.* Stevens was not using the Suburban to demonstrate it to potential customers. Rather, he was using the car for his family vacation. The Court finds the Suburban was not a demo.

Defendants also argue the Suburban was not intended as a substitute or loaner vehicle for Stevens' Saturn auto that was being worked on by Classic. Sentry asserts this argument is not relevant to the issue of whether Stevens is an employee under the garage policy. Specifically, Sentry points out the term "insured" is defined in the Safeco personal policy as the named insured as well as any person using Stevens' covered auto with Stevens'

---

2. The Court notes the classifications also include permissive users over twenty five yeas of age, which Sentry asserts deals with customers of Classic. Sentry asserts the classifications are irrelevant as they address the premiums charged by Sentry.

3. As will be explained in detail below, the facts involved in this case involve a rental car (with a rental agreement having been entered into between Stevens and Classic). The ruling made by the Court in this case would have no application to any future case that might involve a demo vehicle.

express or implied permission. *Id.* A covered auto is defined in the Safeco policy as including any auto Stevens does not own, while such is used as a temporary substitute for any vehicle described in the declarations to the Safeco policy. Safeco personal policy at pg. 21. According to Sentry, the only situation where it would be relevant as to whether the Suburban was intended as a temporary substitute for Stevens' Saturn would be if someone other than Stevens was driving the Suburban at the time of the accident and thereafter sought coverage under the Safeco policy. Those facts are not involved in this case because Stevens was driving the car at the time of the accident. Whether the vehicle rented by Stevens was to serve as a temporary substitute for Stevens' personal auto has no bearing on the issues before the Court.

Similar to the situation in *Integon,* Stevens received a loaner car or "rental" car from Classic because Classic was working on Stevens' personal auto. Stevens stated he rented the Suburban because he was having warranty work done by Classic on his personal Saturn. At that time, if Classic provided a loaner vehicle to a customer while the customer's auto was being worked on, Classic required the customer to sign a rental agreement, just as Stevens did in this case. Although the policy in *Integon* utilized the term "customer," Sentry's policy discusses "anyone else required by law to be an insured" which Defendants acknowledge includes Classic's customers. Despite the differences in the policies at issue, the Court finds the *Integon* case persuasive.

In addition to its reliance on *Integon,* Sentry asserts Stevens, in order to be considered an employee, must have been in the course and scope of his employment at the time of the accident.[4] According to Sentry, a person who may have a job with an employer, like Stevens had in this case, is not an employee of his employer at all times. Such a person is an employee only when he is acting in the course and scope of his employment. Sentry relies on *Liberty Ins. Co. of Texas v. Rawls,* 358 S.W.2d 920, 923 (Tex.Civ.App.–Fort Worth 1962, no writ), wherein the garage liability policy included as insureds any "employee ... *while acting within the scope of his duties as such* ...." (emphasis in original). The court stated as follows:

> We here take occasion to note that an employee of the 'named insured' under a garage liability policy is also an 'insured' under the same policy as to any personal liability to third persons injured as the result of an automobile collision involving a vehicle driven by such employee with a third person, provided the employee is, at the time, acting within the course and scope of his employment.

*Id.* at 923.

 According to Sentry, Texas courts have held the meaning of the word employee should be given its plain and ordinary meaning, namely that the person must be engaged in work or service for his employer at the time of the incident in question to be an employee. *See Alvarado v. Old Republic Ins. Co.,* 951 S.W.2d 254, 258 (Tex.App.–Corpus Christi 1997, no writ) ("For purposes of eligibility for workers' compensation benefits, Texas law defines an employee as 'a person, other than an independent contractor or the employee of an independent contractor, who is *engaged in* construction, remodeling, or re-

---

4. The Sentry policy defines "employee" as including a "leased worker" but not including a "temporary worker" or "contract driver." Garage liability policy § VI(J). "Leased worker" means a person leased to you ... to perform duties related to the conduct of Classic's business. *Id.* at § VI(N).

pair work for the employer at the premises of the employer.' ... The meaning of the word 'employee' is the same in the context of a common-law liability claim.")(emphasis added); *Gulf States Underwriters of La., Inc. v. Wilson,* 753 S.W.2d 422, 426 (Tex. App.–Beaumont 1988, writ denied) ("The meaning of the word " 'employee' is the same whether it is construed in the context of a common-law liability claim or one arising from worker's compensation statutes.... In determining the nature of the relationship between the employer and the person employed, the 'supreme test' is whether the former had a right to exercise control over the details of the latter's work."). "In legal usage, *employee* broadly includes all persons of whatever rank or position who are subject to the direction and control of another, such that the relation of employer to employee is like that of master to servant." *Julian v. Patel,* 2002 WL 1300016 *4 (Tex.App.–Texarkana 2002)(not designated for publication)(emphasis in original).

 Sentry asserts Classic may be held liable for the tortious acts of its employees only if the acts are within the course and scope of employment. *Baptist Memorial Hosp. Sys. v. Samson,* 969 S.W.2d 945, 947 (Tex.1998)("Under the doctrine of respondeat superior, an employee is vicariously liable for the negligence of an agent or employee acting within the scope of his or her agency or employment, although the principal or employer has not personally committed a wrong."). In order for the employer to be liable for the act of its employee, the act must be committed within the scope of the general authority of the employee, in furtherance of the master's business, and for the accomplishment of the object for which the servant was hired. *Leadon v. Kimbrough Bros. Lumber Co.,* 484 S.W.2d 567, 569 (Tex.1972). An employer is liable for

the negligent acts of its employee only if, on the occasion in question, the employer had the right and power to direct and control the employee and the performance of the causal act or omission at the time of its occurrence. *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 542 (Tex.2003); *Arbelaez v. Just Brakes Corp.,* 149 S.W.3d 717, 720 (Tex.App.–Austin 2004, no pet.). When an employee deviates from the performance of his duty as an employee for his own personal purposes, his employer is neither responsible nor liable for what occurs during that deviation. *See Drooker v. Saeilo Motors,* 756 S.W.2d 394, 397 (Tex.App.–Houston [1st Dist.] 1988, writ denied).

Texas courts have also held that an employee driving a company vehicle while going to or from lunch or a dinner break is not sufficient to raise an issue of whether the employee was acting within the scope of his employment. *Gant v. Dumas Glass & Mirror, Inc.,* 935 S.W.2d 202, 212–13 (Tex.App.–Amarillo 1996, no writ)("Nor does the fact that Banks was returning from his personal undertaking and was going to the shop to possibly engage in work for Dumas Glass serve to show that he had returned to the zone of his employment, for '[t]he test of liability is whether [Banks] was engaged in [Dumas Glass's] business and not whether he purposed to resume it.' "); *J & C Drilling Co. v. Salaiz,* 866 S.W.2d 632, 637 (Tex.App.–San Antonio 1993, no writ) ("The only factors linking Gonzales to J & C at the time of the accident were that he was J & C's employee, J & C owned the car, and he was on 24–hour call. Once the presumption is refuted, proof that the defendant owned the vehicle and the driver was employed by the defendant, absent other affirmative evidence, does not constitute probative evidence that the driver was acting within the course and scope of his employment and will not support the submission of a jury question on that issue.... There is no

evidence that Gonzales was on a special mission for J & C, that he was performing any service in furtherance of J & C's business, that J & C directed his manner of transportation or his route, or that J & C had the right and the power to direct Gonzales in his driving at the time of the accident."); *see also Bell v. VPSI, Inc.*, 205 S.W.3d 706, 718 (Tex.App.–Fort Worth 2006, no pet.) (recognizing that even when driving a vehicle furnished by the employer, the employee is generally not in the course and scope of his employment while going to and returning from work, unless he has been directed by his employer or is furthering the employer's business).

Relying on *Moritz v. St. Paul Fire and Marine Ins. Co., Inc.*, 48 Wash.App. 521, 527, 739 P.2d 731 (Wa.1987), Defendants assert the issue of "acting within the scope of employment" is different from "acting within the scope of permission" so as to permit insurance coverage. Defendants cite *Coronado v. Employers National Ins. Co.*, 596 S.W.2d 502 (Tex.1980), wherein Sotelo, an employee of White Well Service, was given a company vehicle for use in the performance of his duties. *Id.* at 503. He was involved in an accident while driving the vehicle after stopping by two bars on the way home from work. At issue before the court was whether Sotelo was insured under employers' policy. In holding that Sotelo was not insured, the court distinguished between express and implied permission, stating that:

> Under the standard omnibus clause of an automobile liability policy, an operator is entitled to protection as an additional insured if his use of the vehicle is with either he express or the implied permission of the named insured. While express permission must be affirmatively stated, implied permission may be inferred from a course of conduct or relationship between the parties in which there is a mutual acquiescence or lack of objection by signifying consent. It is usually shown by the usage and practice of the parties over a period of time preceding the occasion on which the automobile was being used.

*Id.* at 504. Applying the "minor deviation" rule to whether Sotelo was insured, the court held:

> Under this rule, the court must determine in each instance taking into account the extent of deviation in actual distance or time, the purposes for which the vehicle was given, and other factors whether the deviation was 'minor' or 'material.'
>
> Under this rule, the relationship of the parties and the scope of the initial permission are very important. Obviously, the same construction could not be applied to the permission given to a regular employee to whom a company vehicle is regulatory assigned as to a one-time user of the vehicle. Likewise, the construction of the permission given to a close family friend would be different from the specific permission given to a casual acquaintance.

*Id.* at 504–05.

Based on the above cases, the Court is not convinced Stevens was an "employee" under the Sentry garage liability policy. The evidence is undisputed Stevens was not actually engaged in work or service for Classic at the time of the accident. Stevens was not acting at his employer's direction or furthering his employer's business at the time of the accident. Stevens was on a personal vacation with his family at the time of the accident. Stevens testified that his only reason for being in Florida was his vacation. As noted above, Stevens' use of the Suburban differed from Stevens' use of demo cars at that time, wherein no paperwork was required and Stevens could choose any car and drive it.

Stevens' boss specifically required Stevens to sign a rental agreement to take the Suburban to Florida for a family vacation. Stevens testified that his "boss just wanted [him] to sign a rental agreement, I guess, in case I had a wreck." Stevens' Depo. at 10:24–11:4 & 12:3–13:4. At that time, Classic only rented cars to customers who were having repair work done on their cars at Classic. Stevens was having repair work done on his Saturn.

The rental agreement bolsters the conclusion that Stevens was not being provided the Suburban by Classic because he was an employee of Classic or for use as a demo. The rental agreement provides that Stevens' personal auto policy with Safeco would cover any accident that he might have while on vacation in the Suburban. The rental agreement itself included a section entitled "Customer Insurance Information" which identifies the auto liability policy which Stevens had with Safeco. The policy number listed on the rental agreement (Y7526005) is the number of the personal liability policy issued by Safeco to Stevens. As the rental agreement shows, Stevens was given permission to use the Suburban, but only on the agreement that his personal insurance was primary and that Classic's insurance would apply only if Stevens' insurance was insufficient to meet the minimum amount required by law.

In a footnote, Defendants assert Sentry is attempting to use the rental agreement as evidence of the parties' intent, but the parole evidence rule precludes evidence attempting to vary the terms of a written agreement. Docket Entry # 23 at pg. 8, n4. According to Defendants, the rental agreement cannot change the clear language of Sentry's policy. Defendants assert the Sentry policy expressly covers employees driving cars owned by Classic, with no restrictions, and Sentry collected a premium for the employees driving furnished autos. Defendants assert Sentry must provide primary coverage for Classic's employees regardless of whether they are acting in the course and scope of their employment. Specifically, Defendants contend Stevens had Classic's express permission to take the Suburban to Florida; thus, the issue of course and scope of employment is irrelevant. The Court disagrees.

Regardless of whether the garage liability policy mentions "scope and course of employment," the term employee is to be given its plain and usual meaning, which under Texas law means one who is actually engaged in the work or service for his employer at the time of the incident in question. As noted above, Stevens' boss at Classic made Stevens sign a rental agreement for the Suburban (something he had never done for his use of a demo) in case he had an accident while on vacation.

Finally, the Court notes the leased auto provision listed under "exclusions" in the Sentry garage policy excludes coverage to any covered "auto" while leased or rented to "others." *Id.* at pg. 81. However, coverage is provided to individuals who were customers if they are using a covered vehicle while their autos were being serviced. *Id.* Although the term "others" is not defined in the policy, Defendants assert it does not include customers or employees. According to Defendants, the Suburban was not "rented" to Stevens because he paid no rental fee and Classic was not in the rental car business at that time.

The leased or rented auto exclusion excludes coverage, without qualification, once a covered auto is leased to another. *LaFleur v. Aftco Enterprises, Inc.*, 927 So.2d 1200, 1209 (La.App. 3rd Cir.2006); *Progressive Max Insurance Company v. Grange Mutual Insurance Company*, 2003 WL 22019604, *3 (Ohio App.2003) (not des-

ignated for publication). If the Court were to accept Defendants' position that the Suburban was not "rented" to Stevens as a customer because he paid no rental fee, then Stevens would fall under the "others" as used in the leased auto exclusion because the term "others" as used in the exclusion means any person, even one who constitutes an insured under the policy. *LaFleur*, 927 So.2d at 1209; *see also Ranger Insurance Co. v. Mancuso*, 652 So.2d 28, 32 (La.App. 5th Cir.1995). However, as noted above, the evidence demonstrates that Stevens was provided the Suburban as a permissive user while he was having work done on his Saturn, as was Classic's policy for customers at that time. Further considering the rental agreement, Stevens would be a customer or permissive user of Classic's for purposes of the Sentry insurance coverage issue.

### 3. The effect of Texas Insurance Code §§ 1952.251 and 1952.252

■■■ The issue of whether Stevens is a customer or permissive user is critical in one other respect as well. Classic's customers or permissive users, including Stevens, fall within the category of insureds under the Sentry policy of "anyone else required by law to be an insured." As such, the only limit of the Sentry policy that could be available would be the minimum amount under the LIMIT OF INSURANCE provision for permissive users. Under the LIMIT OF INSURANCE provision, Classic's garage liability policy with Sentry would only apply to the extent necessary to comply with the minimum amount required by the applicable state law where the accident occurred, if Stevens' personal auto insurance was not sufficient to meet that minimum requirement. However, Sentry asserts that coverage would not be available, based on provisions in the Texas Insurance Code.

Specifically, § 1952.252 of the Texas Insurance Code makes a garage policy like the Sentry policy excess coverage and makes insurance coverage which the garage customer has under his own policy primary. This statute further provides the insurance coverage which the garage customer has on his own is the primary insurance, notwithstanding any terms that may be contained in the garage customer's personal insurance policy. The relevant provisions provide, in pertinent part, as follows:

**§ 1952.251. Definitions**

In this subchapter:

(1) 'Garage customer' means a person or organization other than:

(A) the named insured under a garage insurance policy;

(B) an employee, director, officer, shareholder, partner, or agent of the named insured; or

(C) a resident of the same household as:

(i) the named insured; or

(ii) an employee, director, officer, shareholder, partner, or agent of the named insured.

(2) 'Garage insurance' means automobile insurance as defined by Article 5.01 issued to a named insured who is engaged in the business of selling, servicing, or repairing motor vehicles as defined by commissioner rule or order.

TEX. INS. CODE § 1952.251.

**§ 1952.252. Garage Insurance**

(a) A garage insurance policy may provide that a garage customer is not an insured under the policy and that the coverage under the policy does not apply to a garage customer except to the extent that any other insurance coverage that is collectible and available to the garage customer is not equal to the minimum financial responsibility limits spec-

ified by Chapter 601, Transportation Code.

(b) *Notwithstanding any provisions to the contrary in another insurance policy* as to whether the insurance coverage described by Subsection (a) that is provided under that policy is primary, excess, or contingent insurance, or otherwise, *the other insurance coverage is the primary insurance as to the garage customer.*

(c) A garage insurance policy containing a provision described by Subsection (a) may not cover a garage customer except to the extent permitted by this section, notwithstanding the terms of the other insurance policy providing coverage described by Subsection (a).

TEX. INS. CODE § 1952.252 (emphasis added). According to Sentry, Stevens' personal insurance policy meets the "minimum financial responsibility limits" and as a result, Plaintiff does not have any financial responsibility to the Roches.

Defendants argue § 1952.252 does not change the provisions of Sentry's policy. Defendants take issue with Sentry's position, namely that the Texas Insurance Code, by its express terms, makes a garage customer's personal auto insurance primary over the garage liability insurance policy regardless of what may be provided to the contrary in the customer's policy. Defendants point out that Sentry insures a car dealership, and the Declarations indicate Sentry anticipated insuring sales people and employees while driving furnished cars, and collected a premium accordingly.

■ However, as the above illustrates, Stevens is considered a customer rather than an employee of Classic. As discussed in detail above, since Stevens was not in the course and scope of his employment at the time of his accident, Stevens would not be an employee, but would instead constitute a garage customer for purposes of

§ 1952.252. Under Texas law, courts use words in a statute in their ordinary meaning, unless a statutory definition is given. *Osterberg v. Peca,* 12 S.W.3d 31, 38 (Tex. 2002). Following this rule, the court in *Jones v. Krown,* 218 S.W.3d 746, 749 (Tex. App.–Fort Worth 2007, rev. denied) gave the undefined term "employee" in a Texas statute its plain and ordinary meaning: one who is actually engaged in work or service for his employer at the time of the incident in question. For similar reasons, Stevens would not constitute an employee for purposes of § 1951.251, but would instead constitute a garage customer for purposes of that statute since Stevens was clearly not engaged in any activity for his employer at the time of the accident. Stevens was on vacation with his family.

Sentry's garage liability policy complies with § 1952.252 of the Texas Insurance Code by containing the following clause contained in the LIMIT OF INSURANCE provision:

> For 'contract drivers' and anyone required by law to be an 'insured' for the use of a covered 'auto,' the most we will pay for all damages resulting from one 'accident' involving a covered 'auto' is that portion of the Each 'Accident' Limit of Insurance—'Garage Operations'— Covered 'Autos' needed to comply with the minimum limits provisions of the law in the jurisdiction where the 'accident' took place. When there is other insurance applicable to the 'accident,' we will pay only the amount needed to comply with these minimum limits after the other insurance is exhausted.

Classic garage policy at pg. 84–85. As urged by Sentry, this provision reduces the level of liability it has for drivers of cars owned by Classic who are "permissive" users rather than users described elsewhere in the policy as being covered. Specifically, the effect of this provision is

to reduce the policy limits for certain persons (permissive users) to the minimum insurance limits required in the jurisdiction where the accident took place, thus reducing Sentry's relationship to Stevens from being a primary insurance policy with 500,000 dollars in coverage to an excess insurance policy with a coverage that extends only so far as the Florida statutory minimum.

The LIMIT OF INSURANCE provision is commonly found in garage liability policies and is commonly referred to as a "step-down" provision, the effect of which is to reduce the policy limits for certain insured persons, i.e., permissive users, to the minimum insurance limits required in the jurisdiction where the accident took place. *See, e.g. Universal Underwriters Ins. Co. v. Hill*, 24 Kan.App.2d 943, 955 P.2d 1333, 1336 (1998); *see also Universal Underwriters Ins. Co. v. Allstate Ins. Co.*, 99 Md.App. 595, 638 A.2d 1220, 1222 (1994) (noting the "LIMIT OF INSURANCE" provision is a provision narrowing the breadth of the policy's coverage). Section 1952.252 allows garage customers to be excluded from being insureds under the policy, unless other available insurance to the permissive user is "not equal to the minimum financial responsibility limits" set by Texas law. The Sentry policy does not exclude garage customers from being insureds, but provides that for such permissive users, it will only pay "the amount needed to comply with these minimum limits after the other insurance is exhausted." Thus, as urged by Sentry, the Sentry garage liability policy tracks the language of subsection (a) of § 1952.252 and should be enforced under Texas law.

The cases relied upon by Defendants, including *Moritz v. St. Paul Fire and Marine Ins. Co., Inc.*, 48 Wash.App. 521, 739 P.2d 731 (1987), did not involve a garage liability policy like the one involved in this case. Those cases, in dealing with an omnibus insured provision, show the Court is to focus on the permission given. Here, as the rental agreement shows, Stevens was given permission to use the Suburban, but only on the agreement that his personal insurance was primary, and that Classic's insurance would apply only if Stevens' insurance was insufficient to meet the minimum amount required by law. This shows the permission given to Stevens to use the auto was given consistently with the following portion of the LIMIT OF INSURANCE provision of the Sentry policy:

> For 'contract drivers' and anyone required by law to be an 'insured' for the use of a covered 'auto,' the most we will pay for all damages resulting from one 'accident' involving a covered 'auto' is that portion of the Each 'Accident' Limit of Insurance—'Garage Operations'—Covered 'Autos' needed to comply with the minimum limits provisions of the law in the jurisdiction where the 'accident' took place. When there is other insurance applicable to the 'accident,' we will pay only the amount needed to comply with these minimum limits after the other insurance is exhausted. . . .

Garage Liability Policy at pgs. 84–85. Stevens was given permission to use the Suburban only as "anyone required by law to be an insured."

The Sentry policy would only provide coverage to Stevens to the extent his insurance was insufficient to meet the minimum amount required under Florida law (since that is where the accident occurred). The minimum requirements of Florida law, since two claimants are involved, would amount to limits of $20,000 for bodily injury and $10,000 for property damage. *See* § 324.021(7), Fla. Stat. (Supp.2012). Stevens' personal auto policy with Safeco has liability limits applicable to this matter, since two persons are involved, of $50,028

for bodily injury and $25,028 for property damage. (Doc. No. 19–7, p. 5). Stevens' policy with Safeco therefore provides him with coverage in excess of what would be required under Florida law. Because Stevens is not uninsured or under insured, the Sentry garage policy would not provide any coverage to Stevens. A case illustrating this is *Steinberg v. Universal Underwriters Ins. Co.*, 272 Ill.App.3d 79, 208 Ill.Dec. 743, 650 N.E.2d 14, 17 (1995) (noting that as permissive user's personal auto coverage was sufficient to comply with the minimum amount required by law, the garage policy would not be called into play). Accordingly, summary judgment should be rendered to Sentry declaring that it provides no coverage to Stevens arising from his March 20, 2010 auto accident with the Roches and the lawsuits filed by them.

### B. Whether Sentry has a duty to defend Stevens in the underlying lawsuits

Finally, Sentry asks the Court to declare that it has no duty to defend the underlying lawsuit filed against Mark Stevens by the Roches. Defendants assert the duty to defend is governed by the "eight-corners" rule and is determined by the pleadings and the policy. "The eight-corners rule provides that when an insured is sued by a third party, the liability insurer is to determine its duty to defend solely from terms of the policy and the pleadings of the third-party claimant. Resort to evidence outside the four corners of these two documents is generally prohibited." *GuideOne Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305, 307 (Tex.2006). "If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured." *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 654 (Tex.2009). Although the Texas Supreme Court has never expressly recognized an exception to the eight-corners or "complaint-allegation rule" rule, other courts have. "Generally, these courts have drawn a very narrow exception, permitting the use of extrinsic evidence only when relevant to an independent and discrete coverage issue, not touching on the merits of the underlying third-party claim." *Id.*

In *International Service Insurance Co. v. Boll*, 392 S.W.2d 158, 160 (Tex.Civ.App.–Houston 1965, writ ref'd n.r.e.), the court stated as follows:

> If the petition does not state facts sufficient to clearly bring the case within or without the coverage, the insurer is obligated to defend if there is, potentially, a case alleged within the coverage of the policy. This obligation is not affected by facts ascertained before suit, or developed in the process of litigation, or by the ultimate outcome of the suit. However, the insurer cannot be called on to defend a suit against the assured in which the petition upon its face alleges a state of facts not covered by but excluded from the provisions of the policy.

*Id.* at 160.

In *Colony National Ins. Co. v. Unique Industrial Product Company*, 2012 WL 3641523, 487 Fed.Appx. 888 (5th Cir. 2012)(not designated for publication), the Fifth Circuit, in applying Texas law, stated the insured must "first successfully meet his burden of showing that the facts as alleged in the plaintiff's pleadings state a claim against him potentially within the coverage of the insurance policy." *Id.* at *3. "If the insured carries his burden, the insurer, also within the confines of the eight-corners rule, must establish that an exclusion in the policy constitutes an avoidance of or an affirmative defense to coverage of all claims in order to defeat the duty to defend." *Id.* According to the Fifth Circuit, some Texas courts and the

Fifth Circuit have found that extrinsic evidence may be used "when it is initially impossible to discern whether coverage is potentially implicated *and* when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying cases." Id. at *4.

According to Defendants, the pleadings filed against Stevens allege that Stevens was operating a car owned by Classic with Classic's express permission when he was involved in an accident with the Roches, and there is no mention of whether Stevens was on a personal trip or a business trip. The Roches further allege Classic is vicariously liable for the negligence of Stevens pursuant to the Florida Dangerous Instrumentality Doctrine. Florida Compl., ¶ 14. Defendants assert the use of extrinsic evidence in this case would overlap with the facts alleged in the underlying cases. Thus, Defendants assert Sentry may not rely upon the use of extrinsic evidence to determine its duty to defend. Regardless of its indemnity obligations, Defendants assert Sentry has a duty to defend Stevens in this case. The Court disagrees.

The extrinsic evidence as to how Stevens was allowed to use the Suburban (his renting of same) and that he was on vacation relate to what category of insured Stevens falls under in the Sentry policy, i.e. either an employee or "anyone else required by law to be an insured." This relates to the LIMIT OF INSURANCE provision of the Sentry policy as well as the rented or leased auto exclusion. These matters do not touch on or dispute any allegations in the underlying suit, as the suit alleges that Stevens was driving the Suburban with Classic's consent. The evidence in question touches on whether the consent given to use the auto was as an employee or as a customer, which would only relate to cov-

erage, and would fall in the narrow exception followed by the Fifth Circuit in applying Texas law.

Illustrating this is *Ooida*, 579 F.3d at 475–76, wherein the Fifth Circuit held that extrinsic evidence as to whether one was an employee could be considered, as such evidence went solely to the coverage issue involved in that case, and such evidence did not contradict any of the allegations of the pleadings in the underlying suit. The Court finds Defendants' allegations that extrinsic evidence is improperly considered without merit and finds Sentry has no duty to defend or indemnify Stevens in connection with the lawsuits filed against him by the Roches.

## VII. RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Motion for Summary Judgment of Home State County Mutual Insurance Company and Mark Lynn Stevens (Docket Entry # 19) be **DENIED.**

**RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket Entry # 20) be **GRANTED.** The Court further recommends the Court render declaratory judgment that Sentry has no duty to indemnify or defend Mark Lynn Stevens in connection with the lawsuits filed against him by Donald and Barbara Roche, Cause Nos. 11CA919 and 11CA920 respectively, filed in the Circuit Court, Fifth Judicial Circuit, Lake County, Florida arising out of the March 20, 2010 auto accident Stevens was involved in with Donald and Barbara Roche

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C). Failure to file written objec-

tions to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Rodriguez v. Bowen,* 857 F.2d 275, 276–77 (5th Cir.1988).

SIGNED this 16th day of August, 2013.